[Cite as *Liles v. Doyle*, 2014-Ohio-1681.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
ALLEN COUNTY

IN RE:

DUMOND D. LILES,

        CASE NO. 1-13-48

    PLAINTIFF-APPELLANT,

    v.

MARY DOYLE, nka JONES, ET AL.,

    DEFENDANTS-APPELLEES,
    -and-                O P I N I O N

JACKI QUERRY,

    INTERVENOR-APPELLEE.

Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2012 JS 29391

Judgment Affirmed

Date of Decision: April 21, 2014

APPEARANCES:

    *N. Shannon Bartels* for Appellant

    *Christi L. Brown* for Intervenor-Appellee

**PRESTON, J.**

{¶1} Plaintiff-appellant, Dumond D. Liles (hereinafter "Liles"), appeals the judgment of the Allen County Court of Common Pleas, Juvenile Division awarding legal custody of his minor child, K.J.D., to intervenor-appellee, Jacki Querry (hereinafter "Jacki"), K.J.D.'s cousin and godmother. We affirm.

{¶2} On December 26, 2011, K.J.D.'s mother, Pam (hereinafter "Pam"), died in a house fire.

{¶3} On January 18, 2012, Liles filed a complaint seeking legal custody of K.J.D., his biological daughter. (Doc. No. 1). Liles averred that, after the death of K.J.D.'s mother, K.J.D. began residing with her maternal grandmother, Mary Doyle, nka Jones (hereinafter "Mary").[1] (*Id.*).

{¶4} On March 16, 2012, Jacki filed a motion for legal custody of K.J.D., averring that K.J.D. has been residing with her since December 2011 with the consent of Liles and Mary. (Doc. No. 10). That same day, Jacki also filed a motion to intervene. (Doc. No. 12). The trial court granted Jacki's motion to intervene on May 1, 2012. (Doc. No. 28).

{¶5} On May 3, 2012, the magistrate granted Jacki temporary custody of K.J.D. and ordered Liles to pay $214.80 per month in child support. (Doc. No.

---

[1] Mary filed a motion for legal custody of K.J.D. in case no. 2008 JP 09744, a previously filed paternity case. (July 31, 2013 Tr. at 1-2). The trial court consolidated Mary's motion for legal custody filed in the paternity case with Liles' and Jacki's motions for legal custody in this case, trial court case no. 2012 JS 29391. (*Id.*). Because Mary did not file objections to the magistrate's decision granting Jacki legal custody of K.J.D.—or appeal the trial court's judgment entry adopting this decision—we will not discuss further Mary's motion for legal custody or the other case.

26). The magistrate granted Liles unsupervised visitation with K.J.D. no less than three times per week. (*Id.*). The magistrate also granted Mary visitation as agreed by the parties. (*Id.*).

**{¶6}** On July 31 and September 10, 2012, the magistrate held hearings to determine legal custody of K.J.D. (Doc. No. 58). On December 10, 2012, the magistrate filed a decision denying Liles' complaint for legal custody and granting Jacki's motion for legal custody. (*Id.*).

**{¶7}** On December 14, 2012, Liles filed a motion requesting findings of fact and conclusions of law. (Doc. No. 59). On January 7, 2013, the magistrate ordered Jacki to file proposed findings of fact and conclusions of law. (Doc. No. 60).

**{¶8}** On February 6, 2013, the trial court adopted Jacki's proposed findings of fact and conclusions of law as its own. (Doc. No. 61).

**{¶9}** On February 19, 2013, Liles filed a motion for the preparation of a transcript and an extension of time to file objections. (Doc. No. 62). The trial court granted the motion on May 2, 2013. (Doc. No. 63).

**{¶10}** On June 3, 2013, Liles filed objections to the magistrate's decision. (Doc. No. 67).

{¶11} On July 18, 2013, the trial court overruled Liles' objections and adopted the magistrate's decision. (Doc. No. 71). The trial court ordered Jacki to prepare an entry in accordance with the magistrate's decision. (*Id.*).

{¶12} On August 16, 2013, Liles filed a notice of appeal, which was assigned appellate case no. 1-13-42; however, this Court dismissed the appeal for lack of a final appealable order. (Doc. Nos. 74, 79).

{¶13} On September 17, 2013, the trial court filed a judgment entry granting Jacki legal custody of K.J.D. (Doc. No. 82).

{¶14} On September 23, 2013, Liles filed a notice of appeal. (Doc. No. 84). Liles raises one assignment of error on appeal.

### Assignment of Error

**The trial court abused its discretion and erred to the prejudice of Appellant when it found the Appellant was unsuitable to exercise custody of his child.**

{¶15} In his sole assignment of error, Liles argues that the trial court abused its discretion by finding him unsuitable. Liles argues that he had established a relationship with K.J.D. and gave in-kind support and paid some child support. Liles argues that the evidence did not establish that granting him legal custody would have a harmful effect on K.J.D.

{¶16} "[T]he right to raise a child is an 'essential' and 'basic' civil right," and a parent's right to the custody of his child is paramount. *In re Hayes*, 79 Ohio

St.3d 46, 48 (1997), citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990) and *In re Perales*, 52 Ohio St.2d 89, 97 (1977). Because a parent has a fundamental liberty interest in the custody of his child, this important legal right is "[p]rotected by law and, thus, comes within the purview of a 'substantial right.'" *Murray* at 157. Consequently, "parents 'must be afforded every procedural and substantive protection the law allows.'" *Hayes* at 48, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶17} "'[I]n proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important.'" *Reynolds v. Goll*, 75 Ohio St.3d 121, 124 (1996), quoting *Trickey v. Trickey*, 158 Ohio St. 9, 13 (1952). Therefore, absent an abuse of discretion, a reviewing court must uphold the trial court's decision. *Masters v. Masters*, 69 Ohio St.3d 83, 85 (1994). An abuse of discretion will be found only where the decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶18} In legal custody disputes between parents and nonparents under R.C. 2151.23(A)(2):

> [p]arents may be denied custody only if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent

is otherwise unsuitable that is, that an award of custody would be detrimental to the child.

*Perales* at 98, citing *Clark v. Bayer*, 32 Ohio St. 299 (1877). *See also In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, ¶ 17.

{¶19} Several witnesses testified during the two-day hearing on the motions for legal custody. Mark Frysinger of the Lima City Police Department testified that, on December 26, 2011, he responded to Pam's home fire at 717 Dingledine. (July 31, 2012 Tr. at 4). Frysinger testified that he tried to go into the house to look for people three times but he ran out of fire extinguishers, so he had to exit the house and wait for the fire department to arrive. (*Id.* at 5). Frysinger testified that he knew Pam had children with Liles, so he called Liles and informed him of the house fire. (*Id.*). Liles showed up at the scene, called several individuals, and determined that the children had spent the night with their grandmother, Mary, while Pam was working that evening. (*Id.* at 5, 7-9).

{¶20} Warren Pugsley, the fire inspector for the Lima Fire Department, testified that he has been friends with Liles since fifth grade, and Pugsley coached Pam's son, Malik, in youth basketball. (*Id.* at 11-12). Pugsley testified that he saw Liles interacting with K.J.D. fifteen to twenty times over the years he was coaching, and Liles was never inappropriate with K.J.D. (*Id.* at 13-16). Pugsley estimated that he saw Pam and K.J.D. hundreds of times and, of those hundreds of

times, he saw Liles with K.J.D. about 35 to 40 times. (*Id.* at 21). Liles once indicated during a conversation that K.J.D. spent the night at his house, but Pugsley did not have personal knowledge of that fact. (*Id.* at 23). Liles asked Pugsley for advice explaining Pam's death to K.J.D. (*Id.* at 24-25).

{¶21} Dr. McNeal, the pediatrician for Liles' children, Isaiah, Geona, and Jada, testified that Liles was appropriate with Isaiah during medical appointments. (*Id.* at 25-28). McNeal testified that Liles acted "like a father should be, you know, he disciplines if needs to, he's loving to him, you know he hugs him * * *." (*Id.* at 28). Liles also brought Geona and Jada to some medical appointments, according to McNeal. (*Id.* at 28-29). McNeal testified that Tiffany Hinds is the mother of Isaiah, and "Pepper" is the mother of Geona and Jada. (*Id.* at 30). McNeal testified that normally Pepper and Tiffany are present at the appointments, but once Liles brought Geona or Jada to an appointment himself. (*Id.*).

{¶22} Emanuel Curtis, a Lima City Schools Linkage Coordinator, testified that he knew Liles through Liles' son, Desmond. (*Id.* at 31-32). Curtis testified that he was uncertain whether Liles had custody of his sons, including Desmond, but Liles' interaction with his sons was "[a]ppropriate * * * healthy, positive." (*Id.* at 33). Curtis testified that Liles always responded when Curtis needed things done for Liles' children. (*Id.* at 34). Curtis testified that Liles approached him a year or two ago about starting a community center in Lima for young children.

(*Id.* at 35-36). Curtis testified that he has been helping Liles' children for over ten years. (*Id.* at 37). Curtis testified that Virgene Jackson is the mother of Liles' son, Demonte, whom Curtis has mentored since second grade. (*Id.* at 38-39). Curtis testified that Demonte lived with his grandmother, but Liles has been his point of contact concerning Demonte. (*Id.* at 39-40). Curtis testified that he also mentored Liles' son, Marquis. (*Id.* at 41).

{¶23} Pepper Pegg testified that Liles is the father of her two minor daughters, Geona and Jada. (*Id.* at 43-44). Pepper testified that Liles signed the birth certificates for both children, and they apportioned the parental rights and responsibilities for the children without court intervention. (*Id.* at 44). Pepper testified that Liles usually takes the children when she has to work late, on average twenty hours per week. (*Id.* at 45). According to Pepper, Liles has a normal father-daughter relationship with the children; that is, he plays dolls, monsters, and other games with them. (*Id.* at 46). Pepper testified that Liles does not have a child-support order, but he pays for daycare and groceries, and they split anything else. (*Id.*). Pepper testified that she has never had any concern allowing Liles to have the girls, and they have stayed overnight with Liles. (*Id.*). Liles interacts the same with K.J.D. as his other girls, and Liles is attentive to K.J.D., testified Pepper. (*Id.* at 47). Pepper also testified that she has never felt the need to pursue court-ordered child support, but she would if Liles stopped helping her financially.

(*Id.* at 48). Pepper testified that Liles helps by picking up the girls from daycare. (*Id.*). Pepper testified that Liles visited their children monthly when she resided in Pittsburgh and weekly when she resided in Dayton. (*Id.* at 49).

**{¶24}** On cross-examination, Pepper testified that she found out about K.J.D. after Pam passed away, about six to seven months prior to the hearing. (*Id.* at 50). Pepper testified that the longest Liles had one of the girls was one week while Pepper was on vacation. (*Id.* at 51). Pepper testified that Liles brings K.J.D. to her house a couple times each week, and sometimes Liles drops K.J.D. off at her house for a couple hours while Liles takes care of business. (*Id.* at 53). Pepper was not sure whether Liles has custody of any of his other children. (*Id.* at 54). Pepper testified that Liles owns a two-bedroom home, where he has a bedroom for himself and a bedroom for K.J.D. (*Id.* at 55-56). When asked where Geona and Jada would sleep if K.J.D. were in Liles' home, Pepper testified they would sleep in Liles' bed, and Liles would sleep on the couch. (*Id.* at 56). Pepper testified that she took K.J.D. with her children and her mom to the St. Gerard's Festival for about an hour and a half without Liles. (*Id.* at 58).

**{¶25}** Thelma Banks, Liles' sister, testified that she currently lives with her daughter, granddaughter, and nephew, Desmond Liles. (*Id.* at 61-63). According to Banks, Desmond had just been released from prison. (*Id.* at 63, 69). Banks identified Father's exhibit 28 as a photocopy of Desmond's driver's license, listing

her address as Desmond's permanent address. (*Id.* at 62). Banks testified that Liles informed the immediate family that he was having K.J.D. with Pam, but Liles did not inform everyone, including Pepper. (*Id.* at 63-64). Banks testified that Pam allowed Liles to take K.J.D. from her home for visitations, and Liles interacts with K.J.D. very appropriately. (*Id.* at 64). Banks testified that, if the court granted Liles custody of K.J.D., she would help with child care. (*Id.* at 66). Liles gets along with all of his children, except Marquis. (*Id.* at 66-67). Banks testified that Liles has nine children, but the children stayed with their mothers. (*Id.* at 70-71). Banks testified that a few times, Liles left K.J.D. with her for a couple hours at a time so he could attend to business. (*Id.* at 74-76). Banks testified that Liles lives in a two-bedroom house, with a twin bed in the spare bedroom for his children. (*Id.* at 76-77).

{¶26} Scott Querry, Jacki's husband, testified that he is employed at American Heating and Cooling, and he has had contact with Liles over the years. (*Id.* at 77-78). Scott could not recall the last time he was arrested but denied it was in Georgia for failing to have proper insurance; on the other hand, Scott admitted that he had a felony drug conviction. (*Id.* at 78). Scott testified that he was sentenced to 18 months and some of that time he served at the WORTH Center. (*Id.* at 79). Scott did not recall getting arrested for fights at the Alibi bar, but he admitted to a public-intoxication conviction. (*Id.* at 80). Scott testified that Jacki

and he were married on March 15, 2002, and, about two years ago, he and Jacki split up for a period of time, which prompted Jacki to file a petition for support and custody, though that case was ultimately dismissed. (*Id.* at 81).

{¶27} On cross-examination, Scott testified that Jacki and he broke up for a period of seven to eight months, but they have never separated besides that one time. (*Id.* at 83). He testified that he served about a year in prison from 1994 to 1995. (*Id.*). Scott also testified that Jacki and he moved to Georgia in February 2011 so they could spend time with Jacki's family, but they moved back to Lima after Pam's death. (*Id.* at 83-84). Scott testified that his wife, Jacki, his two daughters, and K.J.D. reside in a five-bedroom home. (*Id.* at 85). Scott testified that he has been employed at American Heating and Cooling for three and a half months, and prior to that he was working at Golden Corral while he was attending trade school in Georgia. (*Id.*). Scott testified that K.J.D. and his youngest daughter currently share a bedroom, because they do not want to sleep in separate bedrooms. (*Id.* at 86). He testified that the other bedroom is used when K.J.D.'s brother, Malik, visits. (*Id.*). Scott has not had any drug arrests or convictions since 1994. (*Id.*).

{¶28} Scott testified that Liles has not followed the court-ordered visitation schedule for K.J.D.; rather, Liles comes when he wants and drops off K.J.D. when he wants. (*Id.* at 89). While Scott is working during the day, a babysitter watches

K.J.D. and his other children. (*Id.* at 90). K.J.D. and his daughters are like siblings, according to Scott, and K.J.D. was very close to his girls prior to their move to Georgia. (*Id.* at 90-91). Scott estimated that K.J.D. would visit them three to four days per week before they moved to Georgia, and K.J.D. slept over at their house multiple times. (*Id.* at 91). Scott testified that K.J.D. asked him if she could call him dad, and he agreed. (*Id.* at 92). Scott testified that he is "150%" willing to accept K.J.D. into his home, and he treats K.J.D. as his own daughter, but he also encourages K.J.D. to maintain relationships with Liles and her grandmother, Mary. (*Id.* at 93). Scott testified that Mary has watched K.J.D. and his children before, but typically they take the children two to three times a week to a babysitter while he and his wife are working. (*Id.* at 94-96). Scott recalled his 2008 reckless-operation charge, a 2007 public-intoxication charge, as well as a resisting-arrest charge in 1995. (*Id.* at 95).

{¶29} Dumond Liles testified that he owns a car detailing shop called "First Class Detail." (*Id.* at 97-98). Liles testified that he has children, including: Marquis, Demond, who passed away, Demonte, Desmond, Tiara, Kayla, Ramon, Isaiah, Derrick, Quakie, Daquala, Jada, Geona, and K.J.D. (*Id.* at 98-99, 112). Liles testified that he has Isaiah on Tuesdays and Wednesdays, and he has a similar situation with Isaiah's mother that he has with Pepper, Jada and Geona's mother. (*Id.* at 99). Liles testified that he had provided Pam with a vehicle, and

he visits Jada and Geona "[a]nytime." (*Id.* at 100). Liles testified that he currently visits K.J.D. on Mondays and Thursdays from 4:00 p.m. to 8:00 p.m. and on Sundays from 9:00 a.m. to 1:00 p.m. (*Id.* at 101). Isaiah is two years old, Jada is four years old, Geona is one year old, and K.J.D. is four years old, according to Liles. (*Id.* at 104). He testified that K.J.D. is very social and engaging with her younger half-siblings. (*Id.*). Liles testified that Pepper and his sister, Thelma, have watched K.J.D. during his visitation time when he has had to close up his business for the night. (*Id.* at 106). Liles testified that his business is not a safe environment for K.J.D., because vehicles are moving around all the time, and he has chemicals in the shop. (*Id.* at 106-107). Liles admitted that he did not tell Pepper about K.J.D., because he had K.J.D. around the same time he was in a relationship with Pepper. (*Id.* at 107-108).

{¶30} Liles testified that if the trial court granted his motion for custody, K.J.D. would continue to stay at Cornerstone with her sisters until she was old enough to attend school at Perry. (*Id.* at 111-112). Demond was not Liles' biological child with Tiffany Brownlow; however, Liles has two biological children with Tiffany, Desmond, and Tiara. (*Id.* at 112-113). Liles testified that Demond lived with him a short period of time before passing away, and Desmond lived with him from when he was ten or eleven years old. (*Id.* at 113). According to Liles, Desmond came to live with him because Desmond was constantly getting

into trouble and Tiffany could not handle him. (*Id.*). Liles testified that Tiara used to spend the summers with him when she was younger, but Tiara, now 19, stays with her mother in Cincinnati. (*Id.* at 114). Liles was fourteen years old when Ruth Yarlbrough Hutchins gave birth to his oldest child, Marquis. (*Id.* at 123). Liles testified that his relationship with Marquis was poor, and he was forced to fire Marquis after Marquis was smoking weed and cussing at Liles' shop, where Marquis was working. (*Id.* at 123-124). Ruth did not allow Liles to see Marquis when Marquis was younger, and Marquis played collegiate basketball until he injured his finger. (*Id.* at 125-126).

{¶31} Liles testified that he communicates with Jacki mostly by text messaging. (*Id.* at 120). Liles testified that Jacki has asked him to modify the court-ordered visitation to accommodate K.J.D. (*Id.*). Liles testified that his gross sales in July were $1200 of which $200 was profit. (*Id.* at 127-128). The current location of Liles' car detailing shop has been open for three years, and Liles testified that he also operates a mobile car wash. (*Id.* at 129). Liles testified that he has resided in his home for three years, and K.J.D. has her own bedroom. (*Id.* at 130). Liles also testified that he often sleeps on the couch when Geona and Jada are visiting, but Geona always wants to sleep with him anyway, whether that is on the couch or in his bed. (*Id.*).

**{¶32}** Liles testified that he attempted to pay child support but the agency denied any order was in place; apparently, Liles provided the agency with Pam's name, and the support order was under Jacki's name. (*Id.* at 131). Liles testified that he has made only one payment since correcting this issue with the agency. (*Id.* at 132). Liles testified that he would make sufficient time for K.J.D. (*Id.* at 132-133). Liles testified that Pam and he had a relationship before K.J.D. was born, but afterward their relationship was "hit and miss." (*Id.* at 134).

**{¶33}** When asked again how many children he had, Liles responded, "I got a rule, I don't count, I just take care of them." (*Id.* at 135). When asked to respond to the question, Liles testified that he has 13 children, four of which are still minors. (*Id.* at 136). Liles testified that he was incarcerated from 1991 to 1995 and again from 1998 to 2003. (*Id.* at 139). Liles testified that he spoke to several of K.J.D.'s teachers but he could not recall their names. (*Id.* at 140-141). Liles testified that he was unaware of how much money his business generated in June or July. (*Id.* at 141). Liles admitted that he does not keep paperwork for his business, and he needs to do a better job of that. (*Id.* at 142). Liles could not recall whether he made child-support payments in June, July, or both or whether he made only partial payments. (*Id.* at 144-145). He testified, however, that he purchased clothing, shoes, and toys for K.J.D., and he paid for her hair to be done.

(*Id.* at 145). Liles testified that he is currently in a relationship with a woman, but it is not serious because he has too much else to do. (*Id.* at 148).

{¶34} Liles testified that Demonte lives with his grandmother, Judy Jackson; Jada and Geona live with their mother, Pepper; Isaiah lives with his mother, Tiffany Pine; and, K.J.D. was living with her mother, Pam. (*Id.* at 148-150). Liles testified that he pays $450 per month in rent to a woman he knows only as "Queen Bee." (*Id.* at 151-152). Liles testified that he has never had all of his children overnight at his house the same night. (*Id.* at 154). Liles testified that he did not tell Jacki that he took K.J.D. to urgent care for treatment of mosquito bites, nor did he give Jacki any of the ointment urgent care provided. (*Id.* at 161-162). Liles, however, testified that he monitored K.J.D. to make sure she did not have any allergic reaction to the ointment. (*Id.* at 178-179). Liles testified that he informed Jacki about the counseling appointment he scheduled for K.J.D. (*Id.* at 164).

{¶35} Liles testified that he may be late to his visitation periods when K.J.D. is at Mary's house, because Mary lives further away from his business. (*Id.* at 167). Liles testified that he has made one partial child-support payment since May 2012, but he would have made more payments except for confusion at the child-support agency. (*Id.* at 168). Liles testified that he has investigated providing K.J.D. medical insurance, because she is currently on a medical card.

(*Id.* at 171-172). Liles is self-employed and does not have insurance through his employment. (*Id.* at 177). Liles testified that he was convicted of extortion in 1991 and drug distribution of powder cocaine in 1998. (*Id.* at 174). Liles has not discussed open enrollment with the principal or superintendent of Perry schools. (*Id.* at 175).

{¶36} Mary testified that she lives outside of Cridersville, Ohio in a three-bedroom house on an acre of property. (*Id.* at 180-181). Mary testified that she lives alone, and one of the other two bedrooms is for K.J.D. (*Id.* at 181). According to Mary, K.J.D. gets on the school bus every day at her house, and K.J.D. attends Perry schools. (*Id.* at 182). Mary testified that her driver's license will be reinstated on November 13, 2013, and she currently has SR 22 insurance. (*Id.* at 183). She testified that K.J.D. has two dogs, Princess and King, a bike, a motorcycle, doll babies, toys, clothes, shoes, blankets, pillows, Doras dolls, and "everything" at Mary's house. (*Id.* at 184). Mary testified that her daughter, Pam, gave K.J.D. the same middle name as her. (*Id.* at 185-186). Mary testified that she is Jacki's aunt, and Mary has a good working relationship with Scott and Jacki. (*Id.* at 189-190). Mary testified that she watches K.J.D. often and talks with Jacki daily. (*Id.*). Mary characterized her relationship with Liles as better than it used to be because, in 2006, Pam had to obtain a civil protection order ("CPO") after an incident of domestic violence. (*Id.* at 190-191). Mary testified

that she would be willing to work with Liles so that he could be part of K.J.D.'s life. (*Id.* at 192). Mary watched K.J.D. while Pam was working. (*Id.* at 193).

{¶37} Mary testified that the vehicle Liles had provided Pam had multiple mechanical issues, including problems with the ignition switch and the brakes. (*Id.* at 194). Mary testified that she currently has no driving privileges. (*Id.* at 196). According to Mary, other individuals have mistakenly thought she was driving, because another woman in town has a similar car, and Mary's sister has been driving her car. (*Id.* at 194). Mary also testified that she had a former boyfriend, James Brown, but the relationship ended about four years ago. (*Id.* at 197-199). Mary testified that K.J.D. was born when the CPO was in effect. (*Id.* at 202). Mary testified that she has never been arrested, though she failed to make a court appearance on January 10, 2001. (*Id.* at 205).

{¶38} Mary testified that her driving privileges were suspended after her last OVI conviction two years ago, and her first DUI conviction was ten or eleven years ago. (*Id.* at 207, 231). According to Mary, the trial court indicated that she was eligible for driving privileges. (*Id.* at 232). Mary testified that she attended all of Malik's basketball games with K.J.D. and Pam, but she never saw Liles even though Liles' son played on Malik's team for a while. (*Id.* at 211-212). Mary testified that she saw K.J.D. every day and every weekend. (*Id.* at 216). Mary testified that Liles had very little contact with K.J.D. prior to Pam's death, and she

never saw Liles in the six months prior to Pam's death. (*Id.* at 217). According to Mary, Liles stopped over once or twice to drop off money from the time K.J.D. was born until Pam's death. (*Id.*). K.J.D. enjoys her current living arrangement, according to Mary, and Scott and Jacki have a good home environment. (*Id.* at 225). Mary testified that granting Liles custody of K.J.D. would be detrimental, because K.J.D. is used to being with her, Scott, and Jacki. (*Id.* at 226). Mary did not believe Liles would let her visit K.J.D. if granted custody, but Jacki would. (*Id.* at 226-227).

{¶39} Mary testified that she has been living on her 401(k) retirement for the past several years, but she just withdrew her last settlement and is pursuing Social Security Disability, which would provide her enough finances to provide for K.J.D. (*Id.* at 227-229, 234). Mary testified that, over the past couple months, Liles purchased K.J.D. two outfits and two pairs of shoes. (*Id.* at 230). Mary testified that her living expenses have increased due to injuries she sustained from two dogs biting her. (*Id.* at 234). Mary testified that she has worked most of her life and has paid into Social Security. (*Id.* at 235).

{¶40} Marquis Hutchins testified that he lived with Pam for about a year and a half after K.J.D. was about five to seven months old. (*Id.* at 236-237). Marquis estimated that Liles came to the house about two to three times per month during that time. (*Id.* at 238-239). Marquis testified that most of Liles' visits

lasted 15 to 20 minutes, and Marquis never saw Liles take K.J.D. from Pam's house. (*Id.* at 239-240). Marquis testified that, over the last year and a half while he has been residing with his aunt, he saw Liles with K.J.D. once. (*Id.* at 244-245). When asked about Liles' relationship with K.J.D., Marquis testified, "it wasn't really a relationship." (*Id.* at 247). According to Marquis, Liles saw K.J.D. only a couple times while he was living with Pam, though Marquis acknowledged that he was working a lot during that time and was not always around. (*Id.*). Marquis testified that he did not observe Liles express "a whole lot" of affection toward K.J.D.; in Marquis' words, "it was just like, that's [K.J.D.]." (*Id.* at 248). Marquis testified that Liles' relationship with Geona and Jada was different than his relationship with K.J.D., because Liles spent more time with them than K.J.D. (*Id.* at 252, 257).

{¶41} Michelle Wireman testified that she was friends with Pam since they were 18 years old, and, during the last five years, she would see Pam a couple times each week. (Sept. 10, 2013 Tr. at 2-3). Wireman testified that she was not aware of any relationship between Liles and K.J.D. prior to Pam's death. (*Id.* at 3-4). Wireman testified that, the few times she saw Liles at Pam's, Liles did not interact with K.J.D. or ask about K.J.D. (*Id.* at 5). Wireman attended several of Malik's games, and she saw Liles at some of these games, but Wireman testified

that Liles did not interact with K.J.D. (*Id.* at 6-7). Wireman testified that enrolling K.J.D. in Perry schools was important to Pam. (*Id.* at 10-11).[2]

**{¶42}** Jacki testified that she moved to Lima following Pam's death and lived with her mother-in-law until she and Scott found a house in February 2012. (*Id.* at 11-12). Jacki testified that she resides in the home with her husband, Scott, her two daughters, Briana (9) and Cameron (4), and K.J.D. (4). (*Id.* at 12-13). Although the home has five bedrooms, K.J.D. and Cameron decided to share a bedroom, and they have a bedroom for Malik when he visits. (*Id.* at 13). She testified that K.J.D. attends Head Start through Perry schools Monday through Thursday. (*Id.* at 14). Most of the time, Mary watches K.J.D.; otherwise, K.J.D. is with the babysitter Jacki employs for her other children. (*Id.*). K.J.D. was having nightmares after her mother died, according to Jacki, so K.J.D. would sleep with Jacki; and, because of the nightmares, K.J.D. decided to share a bedroom with Cameron. (*Id.* at 16). Jacki testified that she encourages K.J.D. to talk about and remember her mother. (*Id.* at 16-17).

**{¶43}** Jacki testified that her family, Mary, Malik, and Liles are all important to K.J.D., and K.J.D. was upset when Liles missed visits. (*Id.* at 18). Jacki further testified that Liles saw K.J.D. only a couple of times in the first several months after Pam's death; however, after the court-ordered visitation, Liles

---

[2] The remainder of this witness' testimony was not transcribed due to technical difficulties with the hearing recording. (Sept. 10, 2013 Tr. at 11).

has generally followed the agreed visitation schedule, except that he has not shown up on time and missed a few visitations altogether. (*Id.* at 19). She testified that Liles informed her only once that he was running behind for visitation, and most of the time Liles arrives anytime between 4:00 and 5:00 p.m. (*Id.* at 19-20). Jacki testified that Liles has also been late on Sunday mornings, causing the family to miss church. (*Id.* at 20). Jacki received two child-support payments from Liles, but he is about $680 in arrears. (*Id.* at 36, 38). Jacki testified that Liles asked if he could have an extended visit with K.J.D. on a Sunday to take K.J.D. to the St. Rose festival, but Jacki later discovered that Liles did not go to the festival. (*Id.* at 38).

{¶44} Jacki testified that K.J.D. has a good relationship with Scott and asked to call him "dad" even though K.J.D. knows that Liles is her biological father. (*Id.* at 39-40). Jacki testified that she is concerned with Liles having custody of K.J.D. because K.J.D. has never stayed overnight with Liles, and K.J.D. is not comfortable with Liles. (*Id.* at 42). Jacki testified that Scott and she have no intention of returning to Georgia. (*Id.* at 45). Jacki testified that she did not inform Liles about K.J.D.'s January doctor's appointment, but she told Liles about the dog bite that K.J.D. suffered the following day. (*Id.*). Jacki testified that Liles has not been close to K.J.D. until after Pam's death, and Liles' "history" scares Jacki. (*Id.* at 71).

{¶45} Liles testified that he picked up from Mary's house the vehicle that he allowed Pam to borrow, and the vehicle started up fine. (*Id.* at 75). Liles testified that K.J.D. attended the St. Rose festival with Pepper and his other two daughters, and K.J.D. has grown quite fond of Pepper. (*Id.* at 78). Liles testified that he did consider a couple hours tremendously late for visitations, but it was unnecessary to text Jacki if he was only 40 minutes late. (*Id.* at 82). Liles testified that he has been late for Sunday morning visitations, because he works Saturday night security at various night clubs for extra money. (*Id.* at 83). Liles acknowledged that he does not pay local or federal income taxes, and he gets paid in cash. (*Id.* at 90).

{¶46} When asked why he did not have custody of any of his 13 children, Liles testified "there is no reason for me to have custody but, as far as taking care of my kids, I take care of my kids that's [sic] what I do." (*Id.* at 92). When asked what it meant to raise children, Liles testified, "[b]eing there for them, providing for them, protecting them, just being there period." (*Id.* at 94). When asked why he allows K.J.D. to spend time with Pepper and other individuals during his visitation period, Liles testified:

Because I'm not worried about me and [K.J.D.] being around, because [K.J.D.] love [sic] me. So, all of this relationship stuff and working together, she don't have to work, because she already know

[sic] me. So I don't have to work on our relationship, as far as, us getting to know each other. We already know each other. * * * I spend enough time with [K.J.D.]. I spend enough time with her. It's not like I just take her and drop her off somewhere.

(*Id.* at 96-97).

{¶47} After reviewing the evidence, the trial court concluded that placing the child in Liles' custody would be detrimental to K.J.D., because she has been living with individuals with whom she has established long and significant relationships. (July 18, 2013 Decision, Doc. No. 71). The trial court highlighted the lack of involvement Liles has had with his twelve other children, as well as K.J.D., and Liles' lack of consistent visitation with K.J.D. (*Id.*). Jacki and Scott, on the other hand, provided K.J.D. with a consistent, stable environment, according to the trial court. (*Id.*).

{¶48} The trial court's conclusion that granting Liles legal custody of K.J.D. would be detrimental to her is supported by competent, credible evidence; and therefore, the trial court's decision failing to award legal custody to Liles, K.J.D.'s biological father, does not amount to an abuse of its discretion.

{¶49} Liles lacks a basic understanding of what it means to be a father. Fatherhood is more than siring children—something for which Liles has demonstrated a profound ability. Liles failed to give K.J.D. the one thing that

every child needs—his presence. Liles failed to regularly visit K.J.D. for the first three years of her life, only becoming a parent-figure after Pam's death. Liles testified that he visited K.J.D. while Pam was alive, but several other witnesses, including Liles' own son, testified otherwise. These witnesses described the visits Liles had with Pam and K.J.D. as "business transactions," where Liles would drop off some money to help with K.J.D.'s expenses. Even these episodes were few and far between. Liles did not even tell Pepper, the latest mother of two of his children, that K.J.D. was his child until after Pam's death. The testimony concerning Liles' lack of attention toward K.J.D. was consistent and voluminous.

{¶50} Liles' attitude toward spending time with K.J.D. did not substantially change after Pam died, either. When given the opportunity to exercise visitation, Liles often dropped K.J.D. off with other individuals, failing to take the opportunity to build a relationship with his daughter. When asked about this practice during the hearing, Liles dismissed it as an issue of little importance. Multiple times, Liles would arrive late to his visitation period, disrupting the schedule of others, and he, again, dismissed this as an issue at the hearing. Liles failed to demonstrate that he could offer K.J.D. a stable environment, which was important to K.J.D., especially considering the recent and tragic death of her mother. Liles has never had legal custody of any of his twelve other children. Given Liles' business, his multiple children, and multiple women—including a

new girlfriend for whom Liles claimed he did not have much time—it is doubtful that Liles would make appropriate time for K.J.D.

{¶51} Liles testified that he provided for his children, but Liles' idea of providing is not making court-ordered child-support payments. Liles has never made court-ordered child-support payments for any of his children. When given the opportunity to make child-support payments in this case, Liles failed to do so and blamed the child-support agency for his failure. Conveniently for Liles—and not his multitude of children—Liles runs a "cash business" and was unable to testify concerning his income during the hearing. Liles freely admitted that he fails to pay local and federal income taxes, and recalled various extra jobs along the way during the hearing. Liles failed to investigate obtaining health insurance for K.J.D., because she was "on a medical card," demonstrating again Liles' failure to accept responsibility for his own child—the very bare minimum a father is required to do. Liles testified that he provided for his children, but, from the testimony, it appears that the support is limited to some shoes, some clothes, a haircut, and a manicure (for a four-year-old)—hardly the type of consistent financial support a child needs and deserves.

{¶52} Finally, the evidence raised serious questions about whether Liles would allow Mary, Jacki, and Scott visitation with K.J.D., even if the trial court had ordered the same. And, even if Liles *wanted* to allow the visitation with

K.J.D., Liles demonstrated an inability to follow the visitation schedule and to communicate effectively with Jacki concerning K.J.D. Liles' cavalier attitude toward the court-ordered visitation schedule further supports the trial court's decision in this case.

{¶53} In light of the foregoing, the trial court did not abuse its discretion by denying Liles legal custody of his daughter, K.J.D. Therefore, Liles' assignment of error is overruled.

{¶54} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. concurs.**

**ROGERS, J., concurs in Judgment Only.**

**/jlr**